IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Sandra D. Stevens,                     :

    Plaintiff,                     :

  v.                                   :     Case No. 2:09-cv-00509

Michael J. Astrue,                     :     JUDGE FROST
Commissioner of Social Security,
                                       :

    Defendant.

REPORT AND RECOMMENDATION

I.  Introduction

Plaintiff, Sandra D. Stevens, filed this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her applications for disability insurance benefits and supplemental security income. Those application were both protectively filed on February 20, 2004, and alleged that plaintiff became disabled on September 1, 2000.

After initial administrative denials of her claim, plaintiff was afforded a hearing before an Administrative Law Judge on May 10, 2007. A supplemental hearing was held on December 17, 2007. In a decision dated July 22, 2008, the Administrative Law Judge denied benefits. That decision became the final decision of the Commissioner when the Appeals Council denied review on April 23, 2009.

Plaintiff then timely filed this civil action. The record of administrative proceedings was filed in this Court on September 3, 2009. Plaintiff filed a statement of errors on October 1, 2009. The Commissioner responded on December 3, 2009. Plaintiff filed a reply on December 4, 2009, and the matter is now ripe for decision.

II.  Plaintiff's Testimony

Plaintiff was 33 years old at the time of the first administrative hearing and turned 34 prior to the second hearing. At the first hearing, which was the only one where testimony was taken from her, she testified that she is a high school graduate and has some additional training in the area of activity therapy. She said that she has difficulty with math and also has some reading comprehension problems. (Tr. 442). Plaintiff has a driver's license and drives several times a week to visit a friend, shop for groceries, or to go to her children's school. (Tr. 443-45).

Plaintiff testified that she takes Cymbalta for fibromyalgia and depression. Prior to her most recent pregnancy, she had also taken medication for seizures. (Tr. 447-48). Her medications make her tired. She has problems with her memory which she believes would interfere with her ability to work. (Tr. 448-49). She also has difficulty sitting, standing, walking, and lifting more than 10 pounds. (Tr. 449-51).

Plaintiff last worked in 2003 at a job taking care of horses. She was on her feet the entire day and lifted five to ten pounds. (Tr. 451-52). She also worked as a housekeeper at a retirement center. (Tr. 452).

In a typical day, plaintiff readies her children for school, does household chores such as washing dishes or doing laundry, and may do some outdoor tasks. She grocery shops occasionally and helps to take care of the family's horses. (Tr. 453-55). Her husband is employed, so she takes care of a four-month-old child during the day. (Tr. 457).

Plaintiff also testified to suffering from severe headaches. At times, they will last for days. She has been unable to find anything which relieve the situation. (Tr. 457-58).

In response to questioning from her attorney, plaintiff testified in more detail about her past work history. In 2000,

she worked at a factory making jar lids. She was required to be on her feet for her entire shift and to lift 3 to 4 pounds. She also was a day-care worker, caring for children up to two years old. (Tr. 458-59). She also elaborated on her testimony concerning headaches, stating that they might also be seizures, and that occasionally she had left-sided weakness associated with them. These episodes can last for two, three or four days and occur several times a month. (Tr. 460-61).

### III. The Medical Records

The reports and notes from health care professionals which are found in the administrative record can be separated into three groups. One group deals with plaintiff's physical impairments other than her seizure disorder. A second group deals with her diagnosed psychological conditions. The third group reflects efforts to diagnose and treat her seizure disorder. Because the plaintiff's assignments of error deal only with the seizure disorder, only those records will be summarized in detail.

On June 1, 2003, plaintiff went to the emergency room primarily for treatment of a chronic respiratory problem, but she mentioned during this visit that she had an episode where the left side of her face went numb. (Tr. 210). Less than two weeks later, she returned to the emergency room complaining that the left side of her body had gone numb. She also reported headaches and slurred speech. An MRI was ordered. (Tr. 213-14). That study was normal. (Tr. 218-19).

On July 8, 2003, plaintiff was admitted to the hospital for the same problem. An episode which occurred on that day lasted longer than usual and plaintiff nearly passed out. An EEG study was a non-diagnostic. She was discharged two days later. (Tr. 226-27).

Plaintiff was seen three times for this problem by Dr.

Delphia, once on December 15, 2003, and again on January 2, 2004 and February 19, 2004. She reported several additional episodes since August of 2003 and noted that medication had not helped. Dr. Delphia thought she might be having seizures and she tried several different medications. The medications did not appear to help, and Dr. Delphia could not confirm that plaintiff was having any type of seizure activity. (Tr. 248-50).

On April 15, 2004, plaintiff's family doctor, Dr. Scoggin, reported that he had been treating plaintiff for some time and that she recently presented with complaints including confusion, weakness, and poor memory. He noted that she needed more evaluation and also noted that the neurologist whom she had seen did not believe she was having seizures. (Tr. 294-95). Plaintiff mentioned her problem with left-sided weakness to Dr. Miller as well when she was seen for a psychological evaluation, and the memory test he administered showed problems with her working memory and overall general memory. (Tr. 296-301).

Plaintiff began seeing Dr. Janusz for her seizure disorder in 2004. In 2005, he ordered an MRI. The results were normal. On December 9, 2005 he reviewed in EEG which was borderline abnormal but not indicative of epileptic seizures. On January 24, 2006, plaintiff reported that she had been treated in the emergency room for headaches and left-sided weakness ten days earlier and stated that her headaches were more frequent and related to the left-sided numbness. She was seen again on June 2, 2006 at which time she reported that medication had decreased the number of headaches and positively affected her spells of altered consciousness. However, she was taken off the medication because she was pregnant. (Tr. 385-94).

Plaintiff was seen by Dr. Cambier on April 27, 2007 for another neurologic consult. At that time, plaintiff reported that she began having intermittent episodes of passing out

while still in grade school.  She described three different types
of seizures or episodes, some of which could be triggered by
stress.  It was noted that various studies were normal and that
most anticonvulsants did not help her.  She also reported that
three relatives had seizures of unknown type.  The assessment was
epilepsy unspecified intractable and plaintiff was urged to
consider inpatient video EEG monitoring, although she needed to
wait until she stopped breast-feeding.  (Tr. 404-06).

Finally, plaintiff underwent another psychological
evaluation by Dr. Miller on July 12, 2007.  She reported, among
other problems, possible seizures and headaches three to four
times per week.  Testing revealed a significant difference in IQ
scores from the prior evaluation as well as lower scores on all
other testing instruments.  Dr. Miller suggested two
possibilities: malingering or deterioration in regard to her
cognitive abilities.  He diagnosed six different psychological
impairments, borderline intellectual functioning, and eight
physical impairments including headaches and possible seizures.
(Tr. 407-14).

## IV.  The Expert Testimony

At the first hearing, Dr. Snider, an internal medicine
specialist, testified as a medical expert.  He stated he was not
comfortable expressing an opinion as to plaintiff's mental
functioning without further studies.  (Tr. 467).  However, based
on the record as it then existed, he testified that there was
very weak evidence that she had a seizure disorder.  He based
that on her abnormal EEG and the episodic spells she described.
(Tr. 468).  She did have chronic myofascial pain and hyperlaxity
of her joints as well as scoliosis in the lower back and a
surgically repaired torn labrum in her left shoulder.  Finally,
she had a diagnosis of a major depressive disorder.  (Tr. 469).
He did not believe that any of these impairments individually or

in combination met or equaled a listed impairment. (Tr. 469-70). He restricted her from driving a vehicle in the workplace and did not think she should be exposed to dangerous machinery, heights, scaffolding or ladders. She also needed to work in an air-conditioned environment because of her fibromyalgia and should not work in an excessively humid environment. He did not impose any limitations on sitting, standing, walking, or lifting. (Tr. 470).

Dr. Parker testified as the medical expert at the second administrative hearing. He stated that plaintiff had, since childhood, episodes of altered consciousness and altered function. He described several different types of episodes including left-sided loss of function and weakness, headaches, clumsiness, and trouble thinking. He also noted a diagnosis of depression and anxiety. (Tr. 492-93). He specifically diagnosed a seizure disorder but did not know whether the seizures were epileptic or not. He thought the episodes having the largest impact on her ability to function were the ones which occurred two to three times a month and lasted for several days each time. (Tr. 493-94). Dr. Parker believed that her disorder equaled Listing 11.03 because the time elapsed to deal with her episodes exceeded one day a week. (Tr. 495). He concluded that the onset date for this disability was "certainly as of April" of 2007. (Tr. 500). Finally, he restricted plaintiff to light work activities due to the problems with her ligaments and joints. (Tr. 500-01).

Vocational experts also testified at both hearings. At the first hearing, Dr. Walsh described plaintiff's past work as a day care worker, cleaner, and assembler as performed at the light exertional level. Those jobs ranged from unskilled to semi-skilled. Her work as a horse tender was performed at the light and unskilled level although it is typically performed at the

heavy level. (Tr. 475-76). If plaintiff were limited as described by Dr. Snider, she could still work as a day care provider or cleaner and could do 60 to 70% of light and unskilled sedentary jobs. (Tr. 477). If she had certain additional psychological limitations, the day care provider job would be eliminated and the number of other light and sedentary jobs she could do would be reduced but not eliminated altogether. (Tr. 477-78).

Dr. Oestreich was the vocational expert who testified at the second administrative hearing. He was asked to assume that plaintiff was limited as described by Dr. Snider at the first hearing and had the additional physical limitations identified by Dr. Parker at the second hearing. With those restrictions, she could still perform the assembler, cleaner, and day care worker jobs. (Tr. 505-06). She could also perform about 60% of the indoor light work jobs in her region. (Tr. 506). If she also had the additional psychological limitations which had been described to Dr. Walsh, she could return to all three of her past relevant jobs. (Tr. 506-07).

V. The Administrative Decision

In the administrative decision, the Commissioner found that plaintiff suffered from severe impairments including a possible seizure disorder, fibromyalgia, depression, and anxiety. With these impairments, plaintiff was limited to the performance of work at the light exertional level with some environmental restrictions. Additionally, she could not drive automotive equipment in the workplace, could not work around dangerous machinery or unprotected heights, and could not be on ladders or scaffolds. Further, she could do only simple, routine and repetitive tasks in a low-stress environment. She could have general contact with co-workers, supervisors, and the general public. The Commissioner found that plaintiff could still

-7-

perform her past jobs as a day care worker, cleaner and assembler. Consequently, plaintiff was not entitled to a finding of disability.

VI. Legal Analysis

In her statement of errors, plaintiff raises the following issues. First, she asserts that proper weight was not given to the opinion of Dr. Parker concerning whether her seizure disorder equaled Listing 11.03. Second, she asserts that the Commissioner erred in first asserting that further clarification of certain medical issues was needed, and then failing to obtain that clarification. Third, she asserts that alternative onset dates for her claimed disability were not properly considered. These contentions are evaluated under the following standard of review.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human

Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

The first issue is whether the Commissioner had a substantial basis for rejecting Dr. Parker's testimony that plaintiff's seizure disorder, while it did not meet Listing 11.03 because she did not satisfy that Listing's requirement about the frequency of her seizures, nevertheless was the equivalent of the Listing because her less-frequent seizures were of such severity and duration that they similarly precluded her from working. In order to address this issue, it is necessary to recite in detail the basis for the Commissioner's decision to reject that aspect of Dr. Parker's testimony.

In the section of the administrative decision discussing whether plaintiff's impairments met or equaled the Listings, the Commissioner noted, first, that Dr. Snider concluded there was only a remote possibility that plaintiff suffered from a seizure disorder and that he had suggested further testing based on possible dementia. Dr. Snider did not believe her impairment met any of the Listings. The administrative decision also acknowledged that Dr. Parker believed that seizure activity was likely and that plaintiff's impairment equaled Listing 11.03. After discussing his testimony, the administrative decision concluded that plaintiff's mental impairment did not meet or equal the criteria of the Listings 12.04 or 12.06, but made no finding as to Listing 11.03.

However, at a later point in the decision, when the issue of residual functional capacity was being discussed, the Commissioner specifically declined to give weight to Dr. Parker's testimony concerning medical equivalency. The decision recites

that "his analysis is not consistent with or supported by the objective medical record. His testimony regarding medical equivalency appears, in large part, to be based on speculation regarding the frequency of the claimant's seizure-like episodes. There is no objective documentation in this rather voluminous record that substantiates 'seizure' episodes occurring so frequently as to preclude all work activity." (Tr. 27). In connection with that finding, the administrative decision concluded that plaintiff's subjective complaints were neither supported by nor consistent with the medical evidence, that there was not adequate documentation as to cooperation with prescribed treatment given during an ongoing relationship with a treating source, and that it was doubtful that her seizures were as frequent and unpredictable as she described because she continued to drive several times a week, sometimes with her young children in the vehicle. (Tr. 24-25).

The Commissioner is not, of course, required to give controlling weight to the testimony of a medical expert even where, as here, it appears that the expert provided some small amount of treatment to the claimant. This is a case where the medical records do not definitively establish that plaintiff has a seizure disorder. Dr. Snider, the first medical expert, testified that she did not. Dr. Parker's testimony that she did appeared to be based on his belief that if plaintiff were malingering, she would not have been reporting her symptoms so consistently to numerous health care providers. The administrative decision does not entirely discount her testimony but explains why it was not credited fully. That type of credibility determination is peculiarly the province of the Commissioner. See Kirk v. Secretary of H.H.S., 667 F.2d 524, 538 (6th Cir. 1981). If plaintiff's testimony and her subjective descriptions of the frequency and duration of her seizures or

episodes is discounted, the basis for Dr. Parker's opinion about Listing 11.03 is necessarily undercut. For these reasons, the Commissioner did not err in declining to accept that portion of his testimony concerning whether plaintiff's seizure disorder equaled Listing 11.03.

Plaintiff's next contention is that the Commissioner erred by first concluding that more clarification of Dr. Parker's testimony was needed, and then proceeding to make a decision without getting that information. However, the Commissioner's decision explains, at Tr. 22, n.5, that "Counsel objected to sending interrogatories to the medical expert. It is determined that the decision can be issued without additional clarification." Counsel did object, stating specifically in the letter of objection that "I object to the need for any Interrogatories" and that "Interrogatories are unnecessary." See letter dated January 17, 2008, attached to plaintiff's Statement of Errors. It is somewhat anomalous for counsel now to argue that, indeed, interrogatories were necessary and that the administrative decision must be reversed because they were not answered. In any event, plaintiff has offered no basis for her claim that the medical record was in need of clarification beyond the statement made by the ALJ in the letter proposing interrogatories, which statement was later retracted, that such clarification was necessary. The Commissioner did not violate the duty to develop a complete record here, and had an adequate basis for the decision made. Therefore, the second assignment of error is without merit.

Last, plaintiff claims that the Commissioner failed to consider other onset dates such as the 2004 date proposed by Dr. Parker, or a 2007 date which she offered in her January 17, 2008 letter. However, the Commissioner specifically found that plaintiff "has not been under a disability ... from September 1,

2000 through the date of this decision." (Tr. 28). Essentially, plaintiff's argument is that the evidence was sufficiently strong to compel a finding that she became disabled at some date between the originally-alleged onset date and the date of the administrative decision. The Court has already determined, however, that substantial evidence supported the Commissioner's decision not to accept the only testimony that would have required such a finding. This third assignment of error provides no independent basis for overturning the Commissioner's decision.

## VII. Conclusion

For the forgoing reasons, it is recommended that the plaintiff's statement of errors be overruled and that judgment be entered in favor of the defendant Commissioner.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District

Court adopting the Report and Recommendation. <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).

                                    <u>/s/ Terence P. Kemp</u>
                                    United States Magistrate Judge